That's the case of Peabody Coal, Constitutional Commission, 510090. Counsel, please. Thank you. Good afternoon. May it please the Court, Mr. McSewar. Is this going back to old-timers' people? Yes, sir, but I can state that I've lost eight pounds. Mr. McSewar and I have agreed to be very short for you this afternoon. Two points I would like to cover. The first one is, in this case, the arbitrator denied the claim on the basis of finding that the petitioner failed to prove that he was disabled within two years as required by Section 1F. The arbitrator made a very specific finding and supported it with comments that the medical records of Dr. Ewell did not support a finding that petitioner complained of work-related breathing problems or was treated for any work-related breathing problems or pulmonary abnormalities. The medical records do not support a finding that he was disabled as is defined in the Act within two years of October 15, 1997. Of course, we know from the record that he stopped working on that day for a completely unrelated medical condition of ill-being, a work-related injury for which he ultimately was awarded permanent total disability benefits under Section 8F. The arbitrator cited Dr. Ewell's records and one of the significant facts from Dr. Ewell's records is we can tell the cause of petitioner's symptomology and complaints that he had over several years. The records substantially document colds and flu and acute bronchitis in situations or medical conditions such as that. Certainly nothing in any way, shape, or form that could be causally related to his employment. The commission in a split decision reversed the arbitrator and there were three areas in the commission's decision that we think are relevant to the argument today. One, when the commission is really citing to petitioner's complaints and when his symptomology began. And again, we know from the medical records why he had those symptoms, why he had those complaints. It's not a situation where we usually see where petitioner doesn't seek any medical treatment at all and we don't have any medical records. We know when petitioner's symptoms began and we know the reasons his symptoms were there. The majority then referred to the fact that petitioner also had numerous test x-rays showing pulmonary and persistent abnormalities. Again, we know from the medical records and the x-ray reports the cause of the abnormalities found on those x-rays. There is nothing in those x-rays that even hints at diagnosis of cold workers' pneumoconiosis. Dr. Selby reviewed a series of x-rays taken over several years in addition to the high-resolution CT scan versus Dr. Coleman who looked at a single set of films when he saw petitioner almost seven years after he last worked as a coal miner. What about Dr. Alexander, a bee reader? Does he support Cohen's diagnosis? He does. We all know the origination of Dr. Alexander and how he gets the films and the procedures behind that. The fact is there's only one doctor who looked at all the x-rays and the high-resolution CT scan who also looked at all the medical records in the case. The commission tied everything into a comment finding Dr. Cohen to be more credible than all the other medical evidence. And their comment was or finding was Dr. Cohen's testimony tying petitioner's symptoms to his mining exposure is sufficient to show disablement within a statutory time frame of two years even though the examination itself occurred outside the time frame. Our contention is that the manifest way to the evidence is to the contrary. When you factor in the multiple x-rays and Dr. Yule's medical records and the sequence of events, the majority's decision is against the manifest way to the evidence. You have a board certified pulmonologist and certified bee reader and Dr. Selby. Dr. Cohen didn't even get involved seven years after the fact. As a matter of fact, they filed the application for adjustment of claim without any admissible evidence in support of the application which was filed four and a half years after he last exposed. And I think it was even longer than that. It was two or three months before the five-year statute of limitation was even going to run. There really isn't any guidance from the commission as to why Dr. Cohen would be more credible than Dr. Selby and the medical records and the x-rays. That is the basis for our argument that the decision is against the manifest way. We also mentioned in the brief the fact that our position is that because petitioner was awarded permanent total disability benefits under Section 8F of the Act for a prior traumatic workers' compensation case. And there is no basis for another award, basically a double recovery under the Work Life Act for an 8D2 award such as in this case. Does Beelman help you on that? I'm sorry? Does Beelman help you on that? Beelman, I see it both ways. I think it can. I first looked at this court's decision in Beelman. That didn't do any good. But in the dissent of Justice Donovan in that case, he was talking about and he cites to the maximum that only a workman can only be 100% disabled. We agree with that. Certainly you can have a situation, we've seen it before, where someone is awarded, they'll have a work cop case pending and an OD case pending. And there will be an award for 8D2 under one case and then there can be an award then subsequently for permanent total disability. I think the question for this court is can you get it in reverse? Can you be awarded permanent total disability? And we all understand the basis for that and it's for loss of income. And be receiving those benefits and then turn around and file and get an award under Section 8D2 of a different act. And unfortunately there just isn't any case law on point on that issue. Our contention is that once you are adjudicated permanent total disability under Section 8F, that's 100% disability. That's all the benefits that you would be entitled to and we would ask that you reverse on that issue. Was that issue raised to the commission? It was not because it was not, it wasn't an issue before the commission because it was their appeal. Okay. It's raised in the sense that it's under the issue of permanent, under age and extent of disability. Thank you. May it please the court, my name is Bruce Messore and I represent Jesse Smith. The commission reviewed the decision of the arbitrator, reversed it and awarded Mr. Smith 15%. The Peabody's arguing that the commission's decision is against the manifest way to the evidence. The first issue was disease and the commission chose to accept the opinion of Dr. Cohen over Dr. Sellard. Dr. Cohen is a qualified pulmonologist and a bee reader and he's the medical director of the nation's system of black lung clinics. He's an assistant professor of occupational health and safety at the University of Illinois. He doesn't personally receive anything for doing the work on the black lung exams or for the depositions. Dr. Sellard is also a qualified pulmonologist and bee reader but that's where his credentials end. The commission's decision to find Dr. Cohen the most credible has support in the record. They get to make that choice. As to the issue of disease, Dr. Cohen found that the x-ray was positive for pneumoconiosis. He said it was caused by coal mining. That conclusion also is not against the manifest way to the evidence. In terms of disability, Dr. Cohen said that because of pneumoconiosis, Mr. Smith couldn't have any more coal mine exposure without risking his health. He also found pulmonary impairment as a result of pneumoconiosis because, as he said, by definition, if you have pneumoconiosis, you have to have impairment. All pneumoconiosis amounts to a scar tissue. A scar tissue can't perform the function of normal healthy lung tissue. There's impairment at the site of each scar whether it can be measured or not. And there's also emphysema at the sites of the scars. Dr. Sellard agreed that the scarring of pneumoconiosis represents non-functioning lung tissue and he said the only treatment for it is to stop the exposure. And Dr. Cohen said it's the official position of the American Thoracic Society that if a miner has co-worker's pneumoconiosis, there's no safe level of exposure. The decision of the commission that Mr. Smith's pneumoconiosis met, there was a medical contraindication of further exposure to coal dust and that it means there's also some level of functional impairment has support in the record. Dr. Cohen also said that pneumoconiosis is a significant contributing factor to Mr. Smith's shortness of breath. Given the decisions of the existence of pneumoconiosis and the existence of disablement from it, the commission's decision was proper. As to the issue of 1F, Dr. Cohen said that nothing but exposure to coal and rock dust causes co-worker's pneumoconiosis. That after he left mining, Mr. Smith didn't have any exposures. That could have been the cause of his pneumoconiosis. And that since pneumoconiosis is a chronic, slowly progressive disease that develops over many years, it's more likely than not that it would have been present when he last worked as a coal miner. Dr. Shelby agreed with Dr. Cohen on the nature of the disease. He said that if he would diagnose someone with pneumoconiosis at any time, he would expect they would have had pneumoconiosis at about that same level when they left the mine. The decision of the commission on Section 1F has support in the record. It's not against the manifest weight of the evidence. Now Peabody cited the Forsyth case for its 1F argument, but it runs into two major problems with Forsyth. First, in Forsyth, the evidence was different. There wasn't any testimony back at that time about impairment from pneumoconiosis. There was only testimony about the medical contraindication of further exposure. But since the Forsyth case, the medical development regarding what pneumoconiosis is at the tissue level has changed, and the evidence has changed in each of the cases. And in this case, there's agreement, Peabody said, that if you have pneumoconiosis, you have functional impairment. And the second problem Peabody has with Forsyth is that what that decision really stood for was that given the evidence in that record, the commission's decision on 1F was not improper. It was a manifest weight case. Peabody then argues that the pneumoconiosis award was a dual award and was barred by the permanent total award he got for his back injury. In essence, what Peabody's arguing is that since Mr. Smith got a total disabling back injury working for Peabody, he should get a pass on the lung disease he got working for him. The law doesn't allow a back injury to shield an employer from liability for an employee's lung disease. There's time spent on that dual award defense in the briefs. I can't do a better job on my feet except for a few practical issues. First, the two problems Mr. Smith has, his back problems and his lung problems, don't arise from the same injury or accident. In fact, according to the definition of pneumoconiosis as a slowly progressing disease, the scarring of pneumoconiosis was in Mr. Smith's lungs long before the day he broke his back. The award for one doesn't have anything to do with the award for the other. Second, the appropriate legal remedy for the two problems arise in two separate statutes, the work contract for the back, the O2D Act for the pneumoconiosis. The dual defense issue wasn't raised at arbitration, so it was waived. There also isn't anything to show it was raised at the commission level. It wasn't discussed by the arbitrator, by the commission majority, or by the dissent. Peabody argues that not filing a motion to dismiss, based on its dual award theory, was to expedite the case so that if its motion was denied, the parties wouldn't have to go back and try the case on its merits. Mr. Smith respectfully requests Peabody to not help it in its case development. Peabody didn't fail to raise the issue out of consideration for Mr. Smith. It either didn't think about it or it didn't think it was worth trying. But in the end, by failing to raise it, it waived it. And in addition, the dual award theory raises some other questions. What if Mr. Smith's chronic, slowly progressive pneumoconiosis develops into progressive mass fibrosis and kills him? If his initial O2D Act claim has been denied, could there be a survivor's claim? And how can the event of a broken back preclude a claim for a lung disease which was already in existence at the time of the back injury? For all these reasons, the Commission is correct in granting the award. And as for the issue of notice, the Act requires a petition to provide notice as soon as practicable and within the statute of limitations. Mr. Smith filed his claim within the statute of limitations, and Peabody isn't arguing that it didn't know the claim was filed. Peabody is arguing that the filing of the claim is a notice, but it doesn't say why the filing didn't put them on notice. And it isn't saying what else would be proper notice. It also isn't saying that getting notice by filing a claim isn't the way notice is customarily given in a black lung claim. But even if the filing of the Act was considered effective, all that would do would be to shift the burden to Peabody to prove it was unduly prejudiced. And even if it had attempted to show the Commission that it was unduly prejudiced, something it did not try to do, it would be up to the discretion of the Commission to determine whether it was part of the claim. The Commission didn't file the claim with a lack of notice, and that was the problem. Mr. Smith had to file his claim as soon as practicable. It's actually regretted by Dr. Alexander on May 1, 2002. He filed his claim 37 days later. That's as soon as practicable. Peabody says that the timing of the notice didn't allow it to have Dr. Selig's exam within the 1F period. But that would have required Mr. Smith to file his claim for pneumoconiosis before he knew he had it. A minor may know he has shortness of breath, but the award isn't for symptoms. It's for having the disease of pneumoconiosis. Not only that, but having all the B readings and exams after the 1F period gives the Peabody advantage because it gives the petitioner another issue to overcome. The decision to let the claim go forward was proper. It has support in the record, and I ask the Court to affirm the decision of the Commission. Thank you. A couple of points. Counsel is talking about notice, and it was filed as soon as practicable. The application was filed, and that gives notice of something to the employer. What he doesn't tell you is when did he send us some medical saying that there is notice that is given as soon as practicable. They only file the application when they get a positive report, but they never send it to us. It takes years for us to get it. In this case, from the day he stopped working, it took him seven years to even get an examination. We understand the limitations with notice. I'm not going to go into it any further than that. Counsel is up here talking about theories, something called a dual award argument and a dual award theory. I have never heard of that. I've been doing this for a long time. I don't know what he's talking about. It certainly is not in his brief. In their brief, as I pointed out in my reply brief, they talk about a credit and A.J. and so forth. That's not the issue before the Court. It's a question of double recovery. It's not a question of credit. They don't cite any case law. In the end, this dual award theory is something that I've heard today for the very first time. The significant thing is really from the Billman case where the Court talks about Section 8F and what it means. What is the purpose behind permanent total disability benefits? Section 8F refers to both complete disability and to statutory total and permanent disability under AD-18, which we all remember from the Billman case. Under this section, 8F, the phrase complete disability applies to those workers who are rendered wholly incapable of work. That's the theory behind permanent partial disability. Is there an impairment? What we're talking about is an impairment of earnings, not a physical impairment. There is no impairment of earnings in this case to justify an award under 8D-2 from the Commission under the OD Act because there's no impairment of earnings. He is already at the maximum amount allowed. He's under permanent total disability. It's not a credit that we're looking for. It's a double recovery. But again, there's no case law and there's nothing really in the briefs about a dual reward theory. What about the consequence of a conclusion of a death benefit, survivor's benefit? Maybe I misunderstood what opposing counsel was talking about. Widow's benefit. I'm sorry? Widow's benefit under the OD Act. Well, the OD Act when it applies to a spouse's benefit, a widow's benefit, if there's a settlement or if there's a reward, you have to make an exception to your terms of settlement or in the award because it's automatically gone unless it's timely filed, number one. But when you settle in ODKs, especially for black law, that's why you see a lot of settlement contracts. They have special language that we are not waiving the widow's rights under this sanction. But I really don't understand his argument. Has that applied? What do you do with his argument about 8F? I'm sorry? What do you do with his argument about 8F? A man gets a permanent total and within the statutory time period, and then he files under the Occupational Disease Act, you get it dismissed because he's gotten a permanent total for a back injury, and within the statutory time period it turns out his back has improved, and you go out and you get the award reduced. And he has no remedy at that point in time for the occupational disease. How do you handle that one? As I handled it in the brief, there is no motion to dismiss. There is no such handle. You go in front of the arbitrator and they say, come back and we'll hear your argument. Let's assume there is no motion to dismiss. You defend on that basis, and they turn around and say, yeah, you've got the homeowner with pneumocomiosis, but we're going to give you zero benefits because you're already a permanent total because of a back injury. The time this case was filed, and it's sort of a red herring from their point, the time this was filed, you only have 30 months in which to file a petition for an increase or decrease. We understand under the effects of this case it could have been done, but logically it could happen. And so what do you do for those employees? Do you borrow them from any recovery because of the occupational disease, merely because they're 100% total? I think once you file a 19-H petition, and let's say I've never, ever seen it happen, where an employer has been able to get an award for waste differential and anything else reduced because of decreased disability. I've never seen it. I've seen it increase but never decrease. But if you get a decrease, they can turn around right then and claim it's still good, they can still file it. What would prevent them from filing it? Okay, so you're saying that they could, under the other act, come in? Sure, if they're no longer a permanent total disability, what stops them from then going under the Occupational Disease Act? Well, if their Occupational Disease Act case had been adjudicated and they had gotten zero benefits because of the permanent total, how can they come back the second time? They can't. I mean, that's the point he's making in his brief. I mean, I'm not suggesting that the – what I am suggesting, I suppose, is we've got a problem here. We're going to create a problem no matter which direction we go in. And so now I suppose the question becomes, which is the least offensive problem we create? I would say the least offensive would be our way simply because in 25 years, I've never seen anything decrease. The only thing that requires is a change in who appoints the commissioners. I'm sorry? We can go back to the days when nobody recovered. Now, you'll get them to be in an atmosphere now where everybody recovers. That changes with the governor. As soon as they change the commission, we change what happens there. But we have the right to try and get some justice out of this thing. I mean, nobody likes him to get a double recovery. I mean, he shouldn't collect two permanent totals at the same time. No, and I've actually seen that. I've seen a permanent total and somebody go back to work. They didn't know about it and they get hurt again. I've seen that happen. That can happen. That's even more plausible than the situation that we have here. But I guess I just can't think of a factual situation where somebody within a 30-month time frame that we're talking about, or even now a 60-month time frame, where it would ever apply. It's such an unlikely situation. And if you have to address something that's so implausible, then I see the argument, I see the point. But I don't think, for practical reasons, it's ever going to happen. Thank you, counsel. The court will take the matter under advisory position.